**Consolidated Case No. 11-12598**
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

Case No. 11-12598

DEFENDERS OF WILDLIFE *et al.*,
Petitioners
v.
BUREAU OF OCEAN ENERGY MANAGEMENT, REGULATION AND
ENFORCEMENT, *et al.*,

Respondents.

Consolidated With Case No. 11-12599

GULF RESTORATION NETWORK, *et al.*,
Petitioners
v.
KEN SALAZAR, SECRETARY OF THE DEPARTMENT OF INTERIOR, *et al.,*

Respondents.
_____

Petition for Review of Bureau of Ocean Energy Management, Regulation and
Enforcement's Approval of Exploration Plan Control No. S-7444
_____

**PETITIONERS GULF RESTORATION NETWORK, FLORIDA
WILDLIFE FEDERATION, AND SIERRA CLUB'S INITIAL BRIEF**

Monica K. Reimer
111 S. Martin Luther King, Jr. Blvd.
Tallahassee Florida  32301
Telephone: (850) 681-0031
*Counsel for Gulf Restoration
Network,  Florida Wildlife Federation
and Sierra Club*

## CORPORATE DISCLOSURE STATEMENT

The undersigned attorney for Gulf Restoration Network, Florida Wildlife Federation, and Sierra Club certifies that these corporations have no parent companies and have never issued stock.

## CERTIFICATE OF INTERESTED PERSONS

On behalf of Petitioners Gulf Restoration Network, Florida Wildlife Federation, and Sierra Club, I hereby certify that, to the best of my knowledge, the following is a complete list of persons and entities who have an interest in the outcome of this case, pursuant to Eleventh Circuit Rules 26.1 and 26.1-3, as amended.

Alabama, State of

American Petroleum Institute

Angelle, Scott A., Secretary of the Louisiana Department of Natural Resources

Barbour, Haley, Governor of the State of Mississippi

Bentley, Robert, Governor of the State of Alabama

Bromwich, Michael R., in his official capacity as Director, Bureau of Ocean Energy Management, Regulation and Enforcement

Bureau of Ocean Energy Management, Regulation and Enforcement, formerly known as Minerals Management Service

Carter, Derb

Center for Biological Diversity

Coe, Alisa

Covington & Burling LLP

Criterion Catalysts & Technologies L.P.

Defenders of Wildlife

Earthjustice

Enterprise Oil North America Inc.

Equilon Enterprises LLC

Ervin, Bradley

Florida Wildlife Federation

Guest, David G.

Gulf Restoration Network, Inc.

Hainkel, Alida C.

Jiffy Lube International, Inc.

Jindal, Bobby, Governor of the State of Louisiana

Jones, Lewis B.

Jones, Walker, Waechter, Poitevent, Carrère & Denègre L.L.P.

King & Spalding, LLP

Louisiana Department of Natural Resources

Louisiana, State of

McDonnell, Deirdre

Mississippi, State of

Murrill, Elizabeth B.

Natural Resources Defense Council

Nexen Inc. (NYSE: NXY)

Nexen Petroleum Offshore USA Inc.

Pecten Cameroon Company LLC

Pecten Victoria Company

Pennzoil-Quaker State Company

Pettit, David

Reimer, Monica K.

Rhyne, Katherine L.

Rosenblum, Carl D.

Royal Dutch Shell plc. (NYSE: RDSA/ RDSB)

Salazar, Kenneth Lee, in his official capacity as Secretary, United States

  Department of the Interior

SCOGI, L.P.

Seidemann, Ryan M.

Shell Chemical LP

Shell Chemicals Arabia LLC

Shell Deepwater Royalties Inc.

Shell Energy North America (US), L.P.

Shell Exploration & Production Company

Shell Frontier Oil & Gas Inc.

Shell Gulf of Mexico Inc.

Shell Offshore Inc.

Shell Oil Company

Shell Onshore Ventures Inc.

Shell Petroleum Inc.

Shell Pipeline Company LP

Shell Trading North America Company

Shell Trading (US) Company

Shell Treasury Center (West) Inc.

Shell Windenergy Inc.

Shilton, David

Sierra Club

SOI Finance Inc.

SOPC Holdings East LLC

SOPC Holdings West LLC

Southern Environmental Law Center

SWEPI LP

Terrell, Megan K.

TMR Company

United States Department of the Interior

United States Department of Justice

Varner, Chilton D.

Wannamaker, Catherine M.

Weaver, Sierra

  Counsel has made a diligent effort to comply with the requirements of Rule 26.1-1, and the above is a complete list of those entities listed in the Rule of which counsel has knowledge.  There may, however, be entities as described in Rule 26.1-1 of which undersigned counsel has no knowledge, including subcontractors, insurers, parent corporations, affiliates, or other entities which may have an interest in this case.

  Respectfully submitted this 21st day of September, 2011

_____
Monica K. Reimer

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Petitioners respectfully request oral argument.  The issue raised in this case – whether the agency responsible for safeguarding the environmental integrity of Gulf Coast waters from oil spill damage properly considered the risk of oil spills in the Gulf Coast offshore region when approving an ultra-deepwater exploration plan – is a matter of importance to all Gulf Coast residents and tourists who use and enjoy Gulf Coast beaches and waters.

# **TABLE OF CONTENTS**

Corporate Disclosure Statement and Statement of Interested Persons …………. C1

Statement Regarding Oral Argument ………………………………………...   i

Table of Contents ……………………………………………………………….   ii

Table of Authorities ………………………………………………………………  iv

Jurisdictional Statement .....…………….…………………….…………….…………   1

Statement of Issues Presented for Review …………………………………..   2

Statement of the Case and Facts …...……………………………………………...   2

I.    Introduction...............................................................................   2

II.   Agency Proceedings ...................................................................   3

III.  Statement of Facts ....................................................................   6

    A. The Agency's Pre-*Deepwater Horizon* Spill
       Risk Assessment ..............................................................   6

    B. The Agency's 2007 Risk Analysis ...............................   7

    C. The Agency's Hypothetical Large Oil Spill ..................   8

    D. The 2008 Risk Analysis .................................................   8

    E. *The Deepwater Horizon* ..................................................   9

    F. The Risks Factors Determined By The Agency Director..............   10

    G. The SEA's Oil Spill Risk Analysis ...............................   11

        1.    Oil Spill Risk from Oil Wells ...............................   11

2.    Oil Spill Risk from Blowouts ............................................. 12

3.    The Agency's "New" Factors and Ultimate
Conclusion ........................................................................ 14

H. The SEA's Environmental Impact Analysis ................................. 12

I.  Post Disaster Agency Action ......................................... 13

J.  Petitioner's Comments ................................................. 13

Summary of the Argument ................................................................. 16

Argument ............................................................................................ 19

I.   Standard of Review ....................................................... 19

II.   The Agency's Risk Analysis is Arbitrary and Capricious ...................... 20

III.   Petitioners Have Standing ........................................................ 23

A. Associational Standing ................................................. 23

B.  Member Standing .......................................................... 25

Conclusion .......................................................................................... 29

Certificate of Completeness ............................................................... 30

Certificate of Service ......................................................................... 31

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Conservation Ass'n v. Norton,*
 324 F.3d 1229 (11th Cir. 2003) ........................................................26

*Friends of the Earth, Inc. v. Laidlaw,*
 528 U.S. 167 (2000)..............................................................23, 26

*Hill v. Boy,*
 144 F.3d 1446 (11th Cir. 1998) ...................................................21, 22

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
 463 U.S. 29 (1983)...........................................................19, 20

*North Buckhead Civic Ass'n v. Skinner,*
 903 F.2d 1533 (11th Cir.1990) ..........................................................19

*Parker v. Scrap Metal Processors, Inc.,*
 385 F.3d 993 (11th Cir. 2004) ..........................................................26

*Sierra Club v. Johnson,*
 436 F.3d 1269 (11th Cir. 2006) ........................................................23

*Sierra Club v. Tenn. Valley Auth.,*
 430 F. 3d 1337 (11th Cir. 2005) ...................................................25, 26

*Sierra Club v. U.S. Army Corps of Engineers,*
 295 F.3d 1209 (11th Cir. 2002) ...................................................19, 20

**STATUTES**

5 U.S.C. §§ 701-706....................................................................19

42 U.S.C. § 4332(C)......................................................................4

43 U.S.C. § 1340.......................................................................1, 4

43 U.S.C. § 1340(c)(1)...................................................................5

43 U.S.C. § 1349(c) ......................................................................1

iv

43 U.S.C. section 1349(c)(3) ...................................................................2

43 U.S.C. § 1349(c)(3) & (5) ..................................................................1

## REGULATIONS

30 C.F.R. § 250.231, *et seq.* ..................................................................1

40 C.F.R. § 1508.4 ..................................................................................4

40 C.F.R. § 1508.9 ..................................................................................4

40 C.F.R. § 1508.28 ..............................................................................13

## JURISDICTIONAL STATEMENT

This consolidated case involves a challenge to the Department of Interior's Bureau of Ocean Energy Management, Regulation, and Enforcement's ('BOEMRE's" or "the Agency's") environmental review and subsequent approval of an exploration plan that covers the drilling of exploration wells in the ultra-deepwaters of the Gulf of Mexico.  The Secretary of the Interior has jurisdiction over the approval of exploration plans under the Outer Continental Shelf Lands Act ("OCSLA").  *See* 43 U.S.C. § 1340.  Regional Supervisors have been delegated the authority to approve exploration plans.  *See* 30 C.F.R. § 250.231, *et seq.*

This court has jurisdiction over the Agency's approval of exploration plans pursuant to the judicial review section of OCSLA.  43 U.S.C. § 1349(c).  That statute requires: a) that the petitioner participated in "the administrative proceeding" related to the plan approval and raised the objections in that proceeding that they ask this court to review; b) that the petitioner be adversely affected or aggrieved by the action; c) that a petition for review be filed within sixty days after the date of the action; and, d) that the petitioner promptly transmitted copies to the Secretary and the Attorney General, 43 U.S.C. § 1349(c)(3) & (5).

Petitioners filed comments on the Exploration Plan at issue and therefore have participated in the administrative proceeding related to the approval of the Exploration Plan in accordance with 43 U.S.C. section 1349(c)(3).  Petitioners are adversely affected and aggrieved by the approval of Shell's Exploration Plan.  *See* Argument Section III, *infra.*  Pursuant to 43 U.S.C. section 1349(c)(3), the petition for review was filed on June 9, 2011 which was within 60 days of BOEMRE's approval on May 10, 2011, and copies of the petition were promptly transmitted to the Secretary and the Attorney General via the Clerk's Office of the Eleventh Circuit and certified mail.  The approval letters issued by the Agency, AR 585, 594, and 596, constituted a final disposition of the claims asserted in the petitions.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Whether BOEMRE improperly issued a finding of no significant impact by erroneously treating all offshore wells as posing the same miniscule blowout risk in the face of the industry standard risk analysis and the findings of the National Commission on the BP *Deepwater Horizon* Oil Spill and Offshore Drilling, both of which indicate that ultra-deep offshore exploratory wells pose a substantial blowout risk.

## STATEMENT OF THE CASE AND FACTS

## I.    Introduction[1]

---

[1] Petitioners' Joint Record Excerpts have been previously submitted.

Before the *Deepwater Horizon* disaster, the Agency had assumed there was no spill risk associated with oil exploration in the Gulf of Mexico. The *Deepwater Horizon* disaster revealed the high risk of oil drilling from a barge floating over a mile above the sea floor, and then drilling through three miles of rock into what may be a high pressure formation. AR 297 (Nat'l Comm'n Report). This case concerns BOEMRE's continuation of its prior assumption that deepwater drilling is a no risk endeavor in the face of a finding by the Agency head, by the industry itself, and by the *Deepwater Horizon* investigatory commission that it definitely is not. The erroneous "no risk" finding is the basis for the environmental impact analysis under challenge in this case.

## II.    Agency Proceedings

This consolidated case involves challenges to BOEMRE's ("the Agency's) environmental review and subsequent approval of Shell Gulf of Mexico's ("Shell's) Supplemental Exploration Plan S-7444 ("S-7444") which proposes the drilling of ten exploration wells in over 7000 foot deep water approximately 70 miles offshore of Louisiana. AR 153, p. 3; AR 222B, p. 2. One of the wells poses the threat of being Shell's "worst case discharge" in the Gulf of Mexico in the event of a blowout. Shell calculates a potential initial uncontrolled discharge of 405,000 barrels of oil per day and a projected total discharge of approximately 45 million barrels of oil if a relief well is necessary to kill the well. AR 222B; AR

217, § (2j).  By comparison, the *Deepwater Horizon* spill was only 60,000 barrels per day and discharged a total of 4.9 million barrels of oil.  AR 222B, 296.

The Outer Continental Shelf Lands Act requires Agency approval of exploration plans, 43 U.S.C. § 1340, which are also subject to review under the National Environmental Policy Act ("NEPA").  Prior to the *Deepwater Horizon* disaster, NEPA review of exploration plans was perfunctory at best.  AR 236, pp. 19-21.  The Agency's pre-disaster NEPA review process was to "categorically exclude" plans from NEPA review based on the factual premise that exploration plans "do not individually or cumulatively have a significant effect on the environment."  *See* 40 C.F.R. § 1508.4.  That premise was proved incorrect by the disaster.

Post-disaster governmental reviews condemned the Agency's NEPA process.  AR 236 (CEQ Analysis of Pre-Deepwater Horizon NEPA Review); AR 237 (CRS Report on MMS NEPA Review).  In light of the fact that its assessment of risk had obviously been wrong, the Agency issued a policy statement in August, 2010, that it was reviewing its use of categorical exclusions as they related to deepwater exploration plans.  AR 242.  Until that review was completed, all high risk exploration plans were required to undergo an Environmental Assessment.[2]

_____

[2] Environmental Assessments ("EAs") are preliminary NEPA documents prepared for the purpose of determining whether an agency must prepare an Environmental Impact Statement ("EIS").  Actions significantly affecting the quality of the human

AR 242.  S-7444 was submitted to the Agency on October 26, 2010.  AR 48.  S-

7444 proposes ten ultra-deepwater exploratory wells that pose the additional risks

described in the policy statement.  Thus, a Site-Specific Environmental

Assessment (referred to by the Agency as an "SEA") was required.  AR 153.  After

undergoing Agency review, the Exploration Plan was "deemed submitted" on

March 31, 2011, which started the running of the statutory 30-day approval process

mandated by OCSLA.  43 U.S.C. § 1340(c)(1).  AR 111.  The Agency posted the

plan and allowed a 10-day public comment period.  AR 153, p. 48.  A draft

environmental assessment was not posted.  An amended plan was posted for

comment on April 13, 2010.  AR 153, p. 48.  Petitioners, among others, submitted

objections and supporting documentation to both the original plan and amended

plan.  AR 222B; 232.

   S-7444 was approved May 10, 2011.  AR 585.  An accompanying

environmental assessment and finding of no significant impact of the same date

concluded that there was "no information to indicate that the proposed action will

significantly affect the quality of the human environment" and therefore no EIS

was required.  AR 153, p. i.  The Agency found that "no new or additional

---

environment requires an EIS.  42 U.S.C. § 4332(C).  That analysis can be foregone
if the agency makes a Finding of No Significant Impact ('FONSI').  40 C.F.R. §
1508.9.

information was provided that required modification of the NEPA review or resulted in changes to the analyses prepared by the SEA."  AR 153, p. 48. Petitioners timely filed petitions for review on June 9, 2011.

## III.    Statement of Facts

### A.    The Agency's Pre-*Deepwater Horizon* Spill Risk Assessment

In 2007, three years prior to the *Deepwater Horizon* disaster, the Agency undertook a NEPA review of the Agency's decision to offer multiple leases in the Gulf of Mexico including the area where S-7444 is located.  AR 10; 11 ("Multisale EIS").  The Multisale EIS described large oil spills (which the Agency defined as greater than 1000 barrels of oil) as "low probability events" which would, at most, introduce 26,474 barrels of oil into the Gulf over the next forty years.  AR 10, p. 4-228; AR 10, p. 4-283.  The Agency then concluded that this vanishingly small risk rendered insignificant an oil spill's adverse impacts on the Gulf of Mexico and its coastline.  AR 10, pp. 4-263 to 4-26); pp. 4-274 to 4-279; pp. 4-279 to 4-283.  To place this analysis in perspective, the *Deepwater Horizon* discharged 4.9 million barrels of oil into the Gulf over the course of 87 days and oiled 681 miles of shoreline including coastal bays and estuaries (the nurseries of most commercial seafood), AR 10, p. 4-292, and beaches, AR 153, p. 2.  AR 253 (Map of Oiling).

6

The Agency's risk analysis, as outlined below, was based on historical data from 1985 to 1999 and looked only at the volume of oil spilled compared to the total volume of oil handled during that time period.

### B.    The Agency's 2007 Risk Analysis

The "spill scenario" used in the Multisale EIS is a historical analysis of statistics from 1985-1999[3] in which an oil spill rate was calculated by taking the amount of oil spilled and dividing that by the total amount of oil handled.  AR 10, p. 4-229 to 4-232.  ("Spill rates were calculated based on the assumption that spills occur in direct proportion to the volume of oil handled and are expressed as number of spills per billion barrels handled.")  Because there hadn't been a spill of greater than 1000 barrels from offshore oil wells, the probability of a spill greater

---

[3] The Agency never even mentions what up to that point had been the largest oil spill in history which took place in the Gulf of Mexico in 1979.  The 1979 *Ixtoc* blowout occurred in the eastern Bay of Campeche (Mexico) during the drilling of an exploratory well.  Thirty days after the spill began, *Ixtoc* crude oil began washing up on Texas beaches.  The surf zone was contaminated with tarballs and large tar mats formed in the intertidal zone.  Although the tar mats were not directly toxic to plants and animals living on the ocean floor, they did result in anoxic conditions and changes in the characteristics of the beach environment.  *Ixtoc* tarballs were found floating in coastal waters and washing up on beaches as far away as Florida.  Almost two decades later, *Ixtoc* spill products continued to be a problem in the coastal waters of the Gulf of Mexico.  AR 484, p. IV-69.  The spill discharged a total of 465,000 metric tons of oil or approximately 3,325,000 barrels of oil.  AR 445, p. 1.  *See* AR 11, p. 134 (describing spills of greater than 1000 barrels).  The well was as difficult to kill as the *Deepwater Horizon*.  AR 445.

than 1000 barrels was calculated to be infinitesimally small.[4]  AR 11, p. 118 (Table 4-16) (spill rate of .13 spills per billions of barrels handled).  Hence, the "low probability."

### C.    The Agency's Hypothetical Large Oil Spill

Based on an analysis of all historical "large" spills data from 1985 to 1999, the Agency estimated that the most likely total volume of a "large" offshore spill in the Gulf's Central Planning Area  ("CPA") (the area of the Gulf where S-7444 is located) would be 4600 barrels and would occur 50 miles off Louisiana.  AR 10, p. 4-232.  It was then assumed this spill would be halted in two days.  AR 10, p. 4-233.  This hypothetical spill volume and hypothetical spill duration were then inserted into a "weathering" model that predicted the severity and persistence of the spill in the environment.  AR 10, p. 4-233.  The result is found in Table 4-36. AR 11, p. 137.  The model predicted the oil slick would last 2 to 10 days and that under the worst case scenario the most shoreline that would be contacted was 30 miles and the largest oil slick resulting from the spill would be 200 acres.  AR 11, p. 137.

### D.    The 2008 Risk Analysis

---

[4] The Agency assumed at least one spill because "there is always a finite chance of any size spill occurring," *i.e.,* acknowledging in a purely technical sense that the risk of a major blowout could not actually be zero.  AR 10, p. 4-243.

The Agency produced a supplemental EIS in 2008 for an area that had not been included in the Multisale EIS.  AR 20, p. iii.  The SEIS uses the same risk assessment methodology, AR 20, pp. 3-26 to 3-34, and reaches essentially the same conclusion.  AR 20, p. x ("The MMS has reexamined the analysis presented in the Multisale EIS and the addition of the 181 South area to the proposed CPA sale area.  No significant new information was found that would alter the impact conclusions as presented in the Multisale EIS.").

### E.    *The Deepwater Horizon*

On April 20, 2010, the Agency's risk assessment was shattered: "The *Deepwater Horizon* blowout produced the largest accidental marine oil spill in U.S. history."  AR 287 (Nat'l Comm'n Report).  On that day, the semi-submersible drilling rig *Deepwater Horizon* exploded, caught on fire, and the next day sank to the ocean floor a mile below the ocean's surface.[5]  AR 153, pp. 10-11; AR 233, pp. 9-10.   Within 5 days the oil slick was approximately 20 miles by 20 miles.  AR 233, p. 10.  The next day, April 26, the oil slick measured 80 miles by 42 miles.  AR 233, p. 10.  Thus, within 6 days the oil slick was well over 2 million acres – more than ten thousand times larger than the worst case scenario in the Agency's 2007 analysis.  Crude oil flowed for 87 days and almost 5 million barrels of oil (over 200 million gallons) discharged  into the Gulf.  AR 153, p. 10.

---

[5] Eleven people died as a result of the explosion and fire.  AR 297, p. vi.

Approximately 641 miles of Gulf coast shoreline were oiled.  AR 153, p. 10; AR 253 (Map of Oiling).

The spill caused the closure of 80,228 square miles of federal waters to commercial and recreational fishing – 36% of the entirety of Gulf of Mexico federal waters.[6]  AR 507.  First time use of dispersants directly on the subsea wellhead produced an unexpected 22 mile long underwater plume of oil, AR 23, which created a "blizzard of oil" that coated the sea floor.  AR 266.

### F.    The Risks Factors Determined By The Agency Director

In a memorandum dated October 1, 2010, the Director of BOEMRE outlined the risk factors associated with deepwater drilling based on what the Agency had learned up to that point from the *Deepwater Horizon* disaster: 1) deepwater rigs (unlike shallow water rigs) operate from floating barges; 2) deepwater wells can have extremely high flow rates, dramatically higher than shallow water wells; 3) very high pressure oil formations are more complex and difficult to drill in very deep water; 4) extreme water depth, very high pressure, and extreme temperatures are major factors affecting the ability to stop a blowout; and 5) exploration wells are the highest risk wells because the character of the underground oil formation is

---

[6] These areas were ultimately reopened for fishing with all areas reopened seven months later.  AR 507.

unknown until it is drilled.  AR 34, pp. 6-7.   All of these factors contributed to the *Deepwater Horizon* disaster.  AR 34, pp. 6-7.

### G.    The SEA's Oil Spill Risk Analysis

The SEA under challenge here includes two oil spill risk analyses, neither of which address the above-described deepwater drilling risk factors determined by BOEMRE Director Bromwich.

#### 1.    Oil Spill Risk From Oil Wells

First, the Agency relies upon the 2007 analysis to find that there is essentially no risk at all because the *number* of spills per barrel produced did not significantly change.  AR 153, p. A-4; AR 11, App. 153, App. A, p. A-4 (Table A-4); *compare* AR 11, p. 116 (Table 4-14).  The Agency had in that analysis assumed a single spill in order to avoid estimating the risk[7] at zero, so the *Deepwater Horizon* catastrophe did not increase the risk.

#### 2.    Oil Spill Risk from Blowouts

Second, the Agency conducts a new analysis which it describes as the spill rate for blowouts per number of wells drilled.  This analysis divides the total number of wells drilled on the Outer Continental Shelf between 1985-1999 (14,067) by the number of spills of greater than 1000 barrels due to blowouts (0).

---

[7] The risk is based on the number of oil wells, which are referred to as "Facilities." That term is not defined in the SEA but the Multisale EIS explains that the term "facilities" refers to all types of oil wells.  AR 11, p. 118 (Table 4-16, n. 2).

AR 153, App. 4, p. A-4.  Because there hadn't been such a spill, the Agency "assigned" one hypothetical spill to avoid the implausible conclusion that an oil spill was impossible.  AR 153, App. 4, p. A-4 (Table A-4, note b).  It then calculated the risk of a spill from a drilling blowout as greater than 0 to less than 0.00007 (by dividing 1 by 14,067).

In another portion of the SEA, the Agency included a cursory discussion of "deepwater" wells:

> When examining only wells in deepwater (in water depths ≥ 500 feet (152 m), past data suggest the chance of a major spill from a deepwater well under current regulations and practices is 1 in about 4,123.

AR 153, p. 6.

### 3.    The Agency's "New" Factors and Ultimate Conclusion

The SEA states that "there are several new factors that were not taken into consideration in the historical/statistical evaluation."  AR 153, p. 6.  Those factors are: 1) new response and containment measures; 2) enhanced oversight (the new "safety" regulations; and 3) the industry's heightened safety awareness.  AR 153, p. 6.  These factors, the Agency claims, taken together with the low estimated spill rate of .07 percent, lead the agency to reasonably conclude that "an accidental spill event is not very likely to occur."

### H.    The SEA's Environmental Impact Analysis

The Agency "tiers," *i.e.,* incorporates by reference and relies upon, the environmental impact analysis in the prior EISs which found no significant impact based on the low probability of an oil spill.  AR 153, p. 9.  *See* 40 C.F.R. § 1508.28 ("Tiering").  As to Shell's proposed drilling activities, the Agency bases its conclusion of no significant impacts on its one per 14,000 analysis.  Because it finds that blowouts are extraordinarily unlikely, adverse impacts from a catastrophic spill are "very unlikely."  *See e.g.,* AR 153, p. 17 (catastrophic spill "could result in temporary and long term offshore water quality degradation that would require extensive recovery times" but catastrophic spill events are not likely to occur as a result of proposed action).

## I.  Post-Disaster Agency Action

Since the *Deepwater Horizon* disaster**,** the Agency has acknowledged the necessity of updating the 2007 Multi-Sale EIS with a supplemental impact statement "to consider new circumstances and information arising, among other things, from the *Deepwater Horizon* blowout and spill."  75 Fed. Reg. 69122 (November 10, 2010).

## J.  Petitioners' Comments

Petitioners submitted comments objecting to use of a risk analysis that totally disregarded the findings of the *Deepwater Horizon* investigatory commission and the oil industry's established risk analysis that places the risk for

13

ultra-deepwater exploration wells at about one hundred times higher than the

Agency's estimate.  First, they explained that the Agency was ignoring the

acknowledged risk factors associated with deepwater drilling.  AR 233, pp. 2-4.

They asserted it was unreasonable for the Agency to calculate risk of deepwater

drilling based on either all wells drilled in the Gulf (most of which are in shallow

water) because the Agency has acknowledged that the risk of drilling in shallow

water is not comparable to the risk of drilling in deepwater.  *See* AR 34, pp. 6-7.

Second, it was unreasonable for the Agency to calculate risk of deepwater drilling

based on all wells drilled in greater than 500 feet of water because that changed

prior industry policy as to what constituted "deepwater drilling" and also ignored

other relevant risk factors such as water depth, well depth, the existence of

extremely high flow formations that could produce immense discharges, and the

risk of drilling into risky high pressure/high temperature formations.  AR 233, pp.

2-4; AR 220.

Petitioners objected to the use of a 500 foot depth as the measure of

"deepwater" drilling because the Agency's prior analyses of deepwater drilling in

the Gulf characterized wells in over 5,000 feet of water as "ultra-deepwater wells,"

AR 301 (MMS, Deepwater Gulf of Mexico 2009, Interim Report of 2008

Highlights, OCS Report 2009-16); AR 302 (MMS, Deepwater Production

Summary by Year); and the S-7444 wells would be in over 7,000 feet of water.
AR 153, p. 4.

Second, the Agency totally disregarded the oil industry's own standard analysis of risk for ultra-deepwater wells. The industry uses the "Mechanical Risk Index" ("MRI"), which evaluates the risk factors raised by Director Bromwich in his October 1st memorandum.[8] AR 303, p. 9. The MRI calculates the complexities present in deepwater oil drilling in the Gulf of Mexico based on a number of factors and then rates the complexity of the well on a 1 to 5 scale with 5 being the most complex. AR 303, p. 9. Those factors include the water depth (ranging from >3,200 feet to >6,700 feet), well depth (ranging from >19,000 feet to >30,000 feet), the number of casing strings, and the percent population penetrating salt. The *Deepwater Horizon* well would represent a 3+ -4 in these rankings. AR 303, p. 9. Only 43 wells have been drilled in the Gulf of Mexico with a complexity level of 3, 4, or 5 which would indicate that the actual risk of catastrophic failure for wells of this nature based on past oil spills is 1 in 43. AR 303, p. 9.

In addition to being in 7,000 feet of water –the most complex water depth in the index – the wells proposed by Shell have a well depth of greater than 28,000

---

[8] In addition to the Bromwich determination factors, the MRI considers the risks associated with drilling through salt layers in the geologic formation. AR 303, p. 9.

feet.  AR 217, (Exploration Plan at § 1a).  Another complexity index factor is that

there is subsea salt in the location where they are being drilled.  AR 304 (DOI,

Map of  Salt Formations Beneath the Gulf of Mexico); AR 217 (Exploration Plan,

Environmental Impact analysis at 42).  These facts indicate that Shell's wells

would be as or more complex than the *Deepwater Horizon* well.

Petitioners also objected that the Agency was also completely ignoring a

major risk factor, *i.e,* that wells in the Gulf of Mexico may be high pressure/high

temperature wells which were not considered economically viable until the mid-

1990s, AR 305, 306, 307, 308, and that these risk factors are known and

recognized by the industry.  AR 305, 306, 307, 308, 315, 316.  For example, the

comments included a powerpoint by Chevron that specifically points out the risks

associated with deepwater drilling and which bluntly states: "Deepwater is a

complex, risky, and costly environment. Many technical challenges remain to be

solved."  AR 305, p.p. 7, 23.  Petitioners also submitted a survey of professionals

who specialize in high pressure/high temperature drilling, which survey was

undertaken after the *Deepwater Horizon* disaster.  AR 309.  The survey describes

the hazards and the major challenges facing operators.  AR 309.

## SUMMARY OF THE ARGUMENT

The Bureau of Ocean Energy Management, Regulation and Enforcement

issued a Finding of No Significant Impact that avoided the formulation of an

16

Environmental Impact Statement based on the conclusion that the risk of a blowout in Shell's proposed exploration wells in "ultra-deepwater" in the Mississippi Canyon was infinitesimally small. The basis for this conclusion was pre-*Deepwater Horizon* risk assessments in 2007 and 2008 that compared blowout risk for shallow water wells and wells that were not in ultra-deepwater. Despite facts in the record established by the Mechanical Risk Index utilized by the oil drilling industry and the findings of the National Commission on the BP *Deepwater Horizon* Oil Spill and Offshore Drilling to the effect that ultra-deepwater drilling poses substantial risks of blowouts, the Agency reiterated its earlier risk assessments.

To reach the conclusion that the risk of a blowout from Shell's proposed ultra-deepwater exploration wells in the Mississippi Canyon, the Agency erroneously assumed that all offshore oil wells – exploration and production wells included, or that all wells over 500 feet in water depth, should be treated as posing the same risks. Based on these assumptions, the Agency concluded that the oil spill risk from Shell's proposed exploration wells is only one in 14,000. Thus, the Agency concluded that the oil spill risk from these proposed exploration wells is so miniscule as to justify a Finding of No Significant Impact.

In reaching the conclusion that the risk is only one in 14,000, the Agency assumed that the oil spill risk is no different in water over 500 feet in depth than in "ultra-deepwater." The Mechanical Risk Index used by the industry assigns its high level of risk to wells drilled in water depths over 6900 feet. The proposed wells at issue would be drilled in over 7000 feet of water. The National Commission concluded that ultra-deep exploration wells pose substantial risks. The Agency also erroneously assumed that the well depth, *i.e.,* the depth from the sea floor to the target formation, is not a factor in assessing risk. The proposed wells would drill through more than five miles of rock, an extreme depth. The Mechanical Risk Index used by the industry counts extreme well depth as a major complicating factor that increases blowout risk. Finally, the Agency assumed that the existence of salt formations in the geologic formation to be drilled through is not a risk factor. Geologic maps of the area of the Mississippi Canyon where the proposed wells would be drilled show the existence of salt formations. The Mechanical Risk Index indicates that the existence of salt formations substantially increases blowout risk.

When these assumptions are corrected, the Mechanical Risk Index indicates that the risk is not one in 14,000 as found by the Agency, but is one in forty three. This court has held that when an agency bases its decision to issue a Finding of No Significant Impact on erroneous assumptions that the risk of an oil spill is virtually

non-existent, the decision is arbitrary and capricious. Here, the Agency's assumptions were erroneous and they resulted in an erroneous conclusion that there is essentially no risk of an oil spill from Shell's proposed ultra-deepwater exploration wells. The Finding of No Significant Impact by the Agency is arbitrary and capricious, and this court should remand the case back to the Agency for further deliberations using the correct assumptions.

## ARGUMENT

## I.  STANDARD OF REVIEW

NEPA challenges are reviewed by the arbitrary and capricious standard, as defined by the Administrative Procedure Act, 5 U.S.C. §§ 701-706. *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1216 (11th Cir. 2002). Under this standard, the appellate court gives deference to the agency decision by reviewing for clear error, and by refraining from substituting its own judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). However, the court must also look beyond the scope of the decision itself to the relevant factors that the agency considered. *Id.* Its duty is to ensure that the agency took a "hard look" at the environmental consequences of the proposed action. *North Buckhead Civic Ass'n v. Skinner,* 903 F.2d 1533, 1541 (11th Cir.1990). This duty requires the court to consider not only the final documents prepared by the agency, but also the entire administrative record.

19

*Sierra Club,* 295 F.3d at 1216 (citing *Mo. Coalition for the Env't v. Corps of Eng'rs of the U.S. Army,* 866 F.2d 1025, 1031 (8th Cir.1989).

An agency has met its "hard look" requirement if it has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " *Motor Vehicle Mfrs.,* 463 U.S. at 43.  The court will overturn an agency's decision as arbitrary and capricious under "hard look" review if it suffers from one of the following: (1) the decision does not rely on the factors that Congress intended the agency to consider; (2) the agency failed entirely to consider an important aspect of the problem; (3) the agency offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise.  *Id.*

If the court finds deficiencies in the agency's reasoning, it may not rectify them or provide a reasoned basis for the agency decision which the agency itself has not articulated.  *Id.*  Instead, it must remand to the agency so that it may reconsider its own reasoning and decision.

## II.    THE AGENCY'S RISK ANALYSIS IS ARBITRARY AND CAPRICIOUS

The Agency's analysis concluded that a FONSI is appropriate because there is only an infinitesimally small risk of an oil spill from these proposed ultra-deep oil wells.  In so doing, it based that analysis on an assumption that the record

demonstrates to be incorrect: that ultra-deepwater oil exploration wells are no different than any category of offshore wells. The Industry's own risk index – the MRI – finds them to be dramatically different, and the Deepwater Horizon investigatory commission reached the same conclusion. AR 36; AR 64. The Agency neither explained away those facts nor considered evidence that reached a different conclusion.

This court found a FONSI to be inadequate under similar circumstances in *Hill v. Boy*, 144 F.3d 1446 (11th Cir. 1998). There, the Corps of Engineers had issued a FONSI for a reservoir construction project based on the assumption that the permit applicant would relocate a liquid petroleum pipeline that coursed underneath the location of the proposed reservoir. *Hill*, 144 F.3d at 1448. Obviously if the pipeline were not relocated, the reservoir posed some risk[9] of a petroleum leak if the pipeline were to be compromised. That risk was discounted to zero through the Corps' assumption that the pipeline would be relocated. *Id.*

---

[9] Although the Corps had observed that there was no known documentation of spills from the pipeline, 144 F.3d at 148, this court remanded the case to the Agency because the Corps had not identified and evaluated the concerns raised by building a reservoir with a petroleum pipeline underneath it. *Id.* at 1451.

However, the record did not support the Corps' assumption that the pipeline would be relocated, which would have reduced the risk to zero.[10]

The Agency has similarly based its decision on an erroneous assumption, in this case that the risk was essentially zero. The Agency assumed that all offshore oil wells pose the same risk, and from that assumption concluded that the blowout risk is one in 14,000 – essentially zero. AR 153, App. 4, p. A-4 (Table A-4). The record actually shows that that the correct assumptions for S-7444 are that the proposed exploration wells would be in ultra-deepwater depth, that the well depth would be over five miles (from sea floor down to the target formation) and that the wells would drill through salt formations. Using these assumptions and the industry standard risk analysis, the risk is one in 43 – a risk over 300 times higher than that calculated by the Agency.

Like the agency's FONSI in *Hill*, BOEMRE's FONSI was based on an erroneous assumption that the risk of a petroleum spill was too small to justify an EIS. Like in *Hill*, the erroneous assumption rendered the FONSI arbitrary and capricious. And like in Hill, this court should remand the Exploration Plan back to BOEMRE for a consideration of the actual risks and consequences of an oil spill.

---

[10] Although the case is silent on the issue, the petroleum pipeline evidently crossed over Snake Creek, the site of the proposed reservoir. *Hill*, 144 F.3d at 147-48 and 148, n.2. Thus, the proposed reservoir would have *increased* rather than *created* a spill risk.

## III.  PETITIONERS HAVE STANDING

### A.    Associational Standing

Petitioners meet the requirements for associational standing for voluntary membership organizations because the members would otherwise have standing to sue in their own right, the interests at stake are relevant to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit.  *Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167, 181 (2000).  *See also, e.g; Sierra Club v. Johnson*, 436 F.3d 1269, 1276 (11th Cir. 2006) (outlining same test for associational standing in the 11th Circuit).  Each of these components is satisfied in conservationist groups' Petition for Review of Shell's exploration plan.

The interests at stake are germane to each conservation organization's purpose.  Gulf Restoration Network ("GRN") is a regional non-profit membership organization "committed to uniting and empowering people to protect and restore the natural resources of the Gulf Region for future generations."  GRN has over 4,653 members who use and enjoy the resources of the Gulf for boating, fishing, swimming, wildlife observation and other recreational and economic activities. Additionally, many members own coastal property on the Gulf.  The use and enjoyment of the Gulf beaches, coastal waters, and adjacent coastal members' property were substantially affected by the BP *Deepwater Horizon* disaster, and

many members fear that the Bureau of Oil Energy Management, Regulation, and Enforcement's continued issuance of approvals for exploration and development without an appropriate analysis of the risk of another drilling disaster further jeopardizes these interests.  See App. A.

Florida Wildlife Federation ("the Federation") is a statewide nonprofit organization whose purpose is "to promote conservation, marine life, and wildlife management and environmental protection" of Florida's fish, wildlife, soil, water, and plant life.  The Federation has long worked to protect the ecological health of Florida's Gulf Coast waters.  One of the primary threats to the ecological and environmental health of Florida's Gulf Coast is offshore drilling.  Many of the Federation's approximately 13,500 members live near, use, and enjoy the Gulf of Mexico and its beaches and adjacent wetlands for recreational and economic activities like fishing, hunting, kayaking, canoeing, boating, and wildlife observation.  These members have suffered diminished use and enjoyment as a result of last year's disaster.  Because the potential adverse effects of another spill would be dire, the Federation on behalf of its members seeks a more thorough review of the risks before approval of this exploration plan.  See Exh E.

The Sierra Club ("the Club") is a national nonprofit organization with approximately 57,000 members residing in the Gulf States of Florida, Alabama, Mississippi, Louisiana, and Texas, who use and enjoy the Gulf Coast beaches and

waters for recreational and economic activities, and to observe and enjoy wildlife. Many of these members were deeply affected by the BP oil spill, and have ongoing concerns that inadequate safeguards are in place to prevent another disaster of such magnitude.  The Sierra Club's mission is to use litigation and policy advocacy, on behalf of its members, "to explore, enjoy, and protect the wild places of the earth, to practice and promote the responsible use of the earth's ecosystems and resources, to educate and enlist humanity in protecting and restoring the quality of the natural and human environment, and to use all lawful means to carry out these objectives."  Accordingly, the Club has consistently been involved in advocacy related to oil drilling in the Gulf of Mexico and in keeping the Gulf of Mexico waters free from pollution.  This litigation directly advances the organization's mission.  See Add. J.

### B.    Member Standing

Members of the conservation organizations have standing to sue in their own right.  Petitioners have standing to sue when three constitutional requirements are satisfied: they must establish that they have suffered injury in fact that is concrete and particularized, not conjectural or hypothetical, that is fairly traceable to the complained-of action of the Defendant, and the requested relief will redress the harm.  *Sierra Club v. Tenn. Valley Auth.*, 430 F. 3d 1337, 1344 (11th Cir. 2005)

citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Friends of the Earth v. Laidlaw, Inc*., 528 U.S. 167, 181 (2000).

Conservation organizations' members meet these requirements. "In an environmental case, an individual plaintiff may show the first of [these] requirements, injury in fact, by attesting that he uses, or would use more frequently, an area affected by the alleged violations and that his aesthetic or recreational interests in the area have been harmed." *Sierra Club v. Tenn. Valley Auth.*, 430 F.3d at 1344-45 (citing *Laidlaw*, 528 U.S. at 183-84); *Parker v. Scrap Metal Processors, Inc.*, 385 F.3d 993, 1004 n.11 (11th Cir. 2004); *Nat'l parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242-43 (11th Cir. 2003).

Addenda A-N contain declarations from members of each conservation organization detailing how their aesthetic, recreational, educational, economic, and health interests have been harmed.[11] For example, members of all three organizations have stated that they were prevented from going to the beach during and immediately following the last oil spill, that recent tropical storm activity has stirred things up again causing more oil to wash ashore in the form of tar balls and tar mats, and that they fear that poor oversight of drilling practices will result in

---

[11] The referenced standing declarations are included in an Addendum which accompanies this brief.

another catastrohic spill with similar significant and ongoing impacts.  Add. A, D, F, I, K, L, M, and N.

Members also describe economic harms that are typical of many Gulf Coast residents.  For example, Cynthia Ramseur saw her kayaking tour business decline dramatically.  Add. C.  Carol Adams-Davis's Dauphin Island property lost over $300,000 in value.  Add. L.  David Rauschkolb feared that his three beachfront restaurants would go out of business, destroying the livelihoods of himself and the 150 people he employs.  Overall, he lost nearly half a million dollars in sales, in addition to the typically expected increase in business, as well as future decreases in sales from tourists who will not be coming back in future years because they found alternative vacation locations.  Add. I.

Many people continue to have serious health concerns as a result of the spill.  People are afraid to eat seafood, even that which they catch themselves.  Add. F, I, and L.  Mr. Rauschkolb remains concerned about the effect that the buried hydrocarbons and attached dispersants could have on the health of his baby daughter, and still does not allow her to play in the sand.  He himself yearned to return to surfing, previously a lifelong staple of stress relief and recreation in his life that he was forced to suspend for nearly a year as a result of the spill.  Add. I.  Additionally, there are concerns that with the recent storms, the remnant oil and dispersant will become aerosolized, posing a potential health risk.  Add. I.

Petitioners' members are concerned with the devastating effects of oil pollution on wildlife.  Jonathan Henderson, for example, has witnessed dolphins choking in oil and pelicans suffocating in crude, and on a number of occasions has come across dead marine mammals, birds, and fish.  Add. B.  Others recall the threat to endangered sea turtles, and how thousands of eggs had to be relocated to avoid the worst of the oil.  Add. G and L.  All are concerned with the ongoing and lasting effects, from buried oil stirred up by storms, to the long-term health effects of the dispersants, to the unknown impacts of ingesting contaminated fish and the long-term effects on fisheries and endangered species populations such as sea turtles.

Most of all, the psychological effect was profound.  The sight of dead bottlenose dolphins and dying pelicans, Add. B, the view from a helicopter of thirty foot wide slicks as the oil besieged the shore, Add. H, the loss of a feeling of economic security and community stability, Add. I, and the painful knowledge that cherished sanctuaries, homes, and sugar-sand beaches would be indelibly altered.  Add. F, H, I, and L.  Becoming conditioned to look for signs of oil, instead of being able to relax and enjoy the natural environment, says Jay Liles, changed his whole relationship with the beach.  Add. F.  "Knowing that the pristine beaches and Gulf I grew up with would never be the same for our daughter was terribly difficult to accept."  Add. I.  Members assert that they have no confidence that the

28

underlying causes of the blowout and poorly managed response have been adequately addressed, and they remain fearful of another catastrophe. Add. A, B, C, D, F, H, I, L, M, and N. Overall there is a lasting, pervasive fear that this will happen again that has taken root deep in the collective psychology of Gulf residents.

The harm described is fairly traceable to BOEMRE's failure to conduct a proper environmental assessment that accurately reflects the risk involved in deep water offshore drilling. Remand of Shell's exploration plan for proper risk assessment would redress members concerns regarding the potential for another catastrophic oil spill in the Gulf of Mexico.

## <u>CONCLUSION</u>

This court should remand BOEMRE's approval of Exploration Plan S-7444 because the assumptions forming the foundation for its Finding Of No Significant Impact are arbitrary and capricious.

Respectfully submitted this 21st day of September, 2011

_____
Monica K. Reimer
111 S. Martin Luther King, Jr. Blvd.
Tallahassee Florida  32301
Telephone: (850) 681-0031
*Counsel for Gulf Restoration*
*Network,  Florida Wildlife Federation*
*and Sierra Club*

29

## <u>CERTIFICATE OF COMPLETENESS</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7), I certify that the foregoing Initial Brief is printed in proportionately spaced typeface of 14 points. The brief is double-spaced except for quotations and footnotes. The side, top, and bottom margins are one inch. According to the word processing system's tally, the word count for the brief is 6,780 (excluding the Certificate of Interested Persons, Statement of Oral Argument, Table of Contents, Table of Citations, Table of Record References in Brief, Certificate of Compliance, and Certificate of Service).

_____
Monica K. Reimer, Attorney

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that pursuant to Rule 15(c), Federal Rules of Appellate Procedure, and to 43 U.S.C. section 1349(c)(3), a true and correct copy of the foregoing was served on this 21st day of September, 2011, by U.S. mail to the parties listed below and also mailed to the 11th Circuit Court of Appeals on September 21, 2011.:

Carl D. Rosenblum
Alida C. Kainkel
Jones, Walker, Waechter, Poitevent,
Carrere & Denegre LLP
201 S. Charles Avenue
New Orleans, LA 70170-5100

Dennis Daughtry
Lars Herbst
Office of the Solicitor
U.S. Department of Interior
1849 C. Street, N.W.
Washington, D.C. 20240

Steven J. Rosenbaum
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401

Peter W. Cleveland
Mississippi Attorney General's Office
550 High Street, Suite 1100
Jackson, MS 39201

Chilton D. Varner
Lewis B. Jones
King & Spalding
1180 Peachtree Street, N.E.
Atlanta, GA 30309-3521

Elizabeth B. Murrill
Office of the Governor, State of
Louisiana
300 State Capitol Drive
Baton Rouge, LA 70821

Eric Holder, Jr.,
US Attorney General's Office
950 Pennsylvania Ave., N.W.
Washington, DC 20530-001

David C. Shilton
U.S. Department of Justice, ENRD
P.O. Box 23795
Washington, D.C. 20026-3795

Katherine L. Rhyne
King & Spalding
1700 Pennsylvania Ave., N.W.
Washington, D.C. 20006-4707

Deirdre McDonnell
Center for Biological Diversity
PO Box 19801
Portland, OR 97280

David Pettit
Stephen Zak Smith
Natural Resources Defense Council
1314 2nd  Street
Santa Monica, CA 90401

Catherine M. Wannamaker
Southern Environmental Law Center
127 Peachtree Street  STE 605
Atlanta, GA 30303-1840

Ryan M. Seidemann
Louisiana Attorney General's Office
1885 N 3rd  Street
PO Box 94005
Baton Rouge, LA 70802-5146

Sierra B. Weaver
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20005-0000

_____

Monica K. Reimer, Attorney